IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| LARRY W. QUESENBERRY, )   )
Plaintiff, )   )
v. )   Civil Action No. 7:13-CV-90   )
CAROLYN W. COLVIN,[1] )
Acting Commissioner of Social Security, )   )
Defendant. ) | |

## REPORT AND RECOMMENDATION

Plaintiff Larry W. Quesenberry ("Quesenberry") filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") finding him not disabled and therefore ineligible for disability insurance benefits ("DIB") under the Social Security Act ("Act"). 42 U.S.C. §§ 401–433. Specifically, Quesenberry alleges that the Administrative Law Judge ("ALJ") erred by not giving the opinion of his treating physician greater weight, relying on incorrect testimony of the vocational expert, and improperly evaluating Quesenberry's credibility. I conclude that substantial evidence supports the ALJ's decision on all grounds. As such, I **RECOMMEND DENYING** Quesenberry's Motion for Summary Judgment (Dkt. No. 13), and **GRANTING** the Commissioner's Motion for Summary Judgment. Dkt. No. 17.

## STANDARD OF REVIEW

This Court limits its review to a determination of whether substantial evidence exists to support the Commissioner's conclusion that Quesenberry failed to demonstrate that he was

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is hereby substituted for Michael J. Astrue as the defendant in this suit.

1

disabled under the Act.[2] "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations omitted). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). In cases such as this, where the claimant has submitted additional evidence to the Appeals Council, and the Appeals Council considered that evidence, this court must review the record as a whole, including the new evidence, to determine whether substantial evidence supports the Commissioner's findings. Wilkins v. Sec'y, Dep't of Health and Human Servs., 953 F.2d 93, 95–96 (4th Cir. 1991).

## CLAIM HISTORY

Quesenberry protectively filed for DIB on June 30, 2009, claiming that his disability began on June 1, 2009.[3] R. 68. The state agency denied his application at the initial and reconsideration levels of administrative review. R. 67–98. On September 27, 2011, ALJ Joseph T. Scruton held a hearing to consider Quesenberry's disability claim. R. 31–66. Quesenberry was represented by an attorney at the hearing, which included testimony from Quesenberry and vocational expert Gerald Wells. R. 31–66. At the hearing, Quesenberry amended his alleged date of disability onset to July 13, 2009. R. 65.

---

[2] The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his ability to perform daily activities or certain forms of work. Rather, a claimant must show that his impairments prevent him from engaging in all forms of substantial gainful employment given his age, education, and work experience. See 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

[3] Quesenberry is insured through December 31, 2013 (R. 68); therefore he must show that his disability began before the end of his insurance period, and existed for twelve continuous months to receive DIB. 42 U.S.C. §§ 423(a)(1)(A), (c)(1)(B), (d)(1)(A); 20 C.F.R. §§ 404.101(a), 404.131(a).

2

On November 14, 2011, the ALJ entered his decision analyzing Quesenberry's claim under the familiar five-step process[4] and denying his claim for benefits. R. 13–26. The ALJ found that Quesenberry suffered from the severe impairments of autonomic dysfunction, subclavian vein stenosis, second–degree heart block, and palindromic rheumatism. R. 18. The ALJ found that these impairments, either individually or in combination, did not meet or medically equal a listed impairment. R. 19. The ALJ further found that Quesenberry retained the residual functional capacity ("RFC") to perform a range of sedentary work, further limited to

> low stress jobs; can sit continuously for two hours at a time and for more than six hours in an eight-hour workday; can stand and/or walk for more than three hours at a time and for more than six hours in an eight-hour workday; is unable to bend over to pick up any significant weight and can less than occasionally bend or twist.

R. 19. The ALJ determined that Quesenberry could not return to his past relevant work as an assistant manager, truck driver, or receiving clerk (R. 24), but that Quesenberry could work at jobs that exist in significant numbers in the national economy, such as a telephone information clerk/receptionist, emergency dispatcher, and information clerk. R. 25. Thus, the ALJ concluded that he was not disabled. R. 26. On January 11, 2013, the Appeals Council denied Quesenberry's request for review (R. 1–4), and this appeal followed.

---

[4] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether he can perform other work. Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R. § 404.1520); Heckler v. Campbell, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. The burden shifts to the Commissioner at the fifth step to establish that the claimant maintains the residual functional capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

3

## ANALYSIS

Quesenberry puts forth three arguments as to why the ALJ's decision is not supported by substantial evidence. First, Quesenberry contends the ALJ gave improper weight to the opinion of his treating physician, J. Edwin Wilder, M.D. Second, Quesenberry asserts that the ALJ erred in relying upon the testimony of a vocational expert in determining that jobs exist in the national economy that he could perform. Last, Quesenberry challenges the credibility determination of the ALJ, who found that Quesenberry's statements about symptoms generally credible, but that he could still work.

### Treating Physician

Quesenberry alleges that the ALJ gave improper weight to the medical opinion of his treating cardiologist Dr. Wilder, and more precisely, that the ALJ incorrectly rejected the portion of Dr. Wilder's opinion that Quesenberry was unable to bend and twist at the waist and required rest. R. 410. The ALJ found that Dr. Wilder's opinion that Quesenberry would never be able to bend or twist was inconsistent with Quesenberry's own statements and the observations of Quesenberry's treating neurologist. R. 24. The ALJ instead found it be reasonable that Quesenberry could bend or twist at the waist less than occasionally, and incorporated that limitation into his final RFC. R. 19. The ALJ gave the remainder of Dr. Wilder's opinion "great weight," incorporating the remainder of the limitations in the opinion. R. 24. I find that this analysis is supported by substantial evidence in the record.

The social security regulations require that an ALJ give the opinion of a treating physician source controlling weight, if he finds the opinion "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). The ALJ must give

4

"good reasons" for not affording controlling weight to a treating physician's opinion. 20 C.F.R. § 416.927(c)(2); Saul v. Astrue, 2011 WL 1229781, at *2 (S.D. W.Va. March 28, 2011). Further, if the ALJ determines that a treating physician's medical opinion is not deserving of controlling weight, the following factors must be considered to determine the appropriate weight to which the opinion is entitled: (1) the length of treatment and frequency of examination; (2) the nature and extent of the treatment relationship; (3) the opinion's support by medical evidence; (4) the opinion's consistency with the record as a whole; and (5) the treating physician's specialization. 20 C.F.R. § 416.927(c)(2)-(5). "None of these factors may be omitted or disregarded by the ALJ in weighing the value of a treating physician's opinion." Ricks v. Comm'r, 2010 WL 6621693, at *10 (E.D. Va. Dec. 29, 2010) (citations omitted).

  The record reflects that Quesenberry has heart conditions and rheumatism, as well as near-syncopal (fainting) episodes, the cause of which has yet to be identified by his medical providers. Quesenberry testified at the administrative hearing that his first syncopal episode occurred in 1997 or 1998. R. 38. Quesenberry stated that these "spells" happen when he leans over or tilts his head down too long, and cause fatigue, dizziness, and disorientation. R. 38, 52. They do not, however, cause total unconsciousness. R. 55. Quesenberry had a pacemaker implanted which relieved his symptoms for several years. R. 38–39. After a second pacemaker surgery again relieved symptoms temporarily, Quesenberry testified that the symptoms returned, causing him to eventually quit working. R. 39, 47. Quesenberry stated that he has these symptoms daily, and that his episodes cause fatigue that require him to sit down. R. 39–40. According to Quesenberry, it often takes him two or three hours to recover from one of these episodes. R. 52. Quesenberry said that as long as he did not tilt his head down and sit up straight, he does not have problems other than the fatigue. R. 43. Quesenberry also testified that he

5

suffered from rheumatoid arthritis, which causes flare ups "once or twice every six months" causing pain in his hips, shoulder, and ankles, making it difficult for him to walk. R. 44, 50–51. In addition, Quesenberry testified that he suffered from constant back pain, and that he could sit for about 30 minutes before having to take a break, and stand for 45 minutes to an hour before needing to take a break. R. 51.

At the time of his alleged onset date of disability in June 2009, Quesenberry had been receiving treatment from both a cardiologist, Dr. Wilder, and other specialists at the Duke Medical Center. Quesenberry reported fatigue and shortness of breath to Dr. Wilder on June 1, 2009, and also that he was having difficulty getting through the workday. R. 321. An electrocardiogram showed sinus bradycardia, with a first degree atrioventricular block. R. 322. Dr. Wilder also found a lack of sensing by Quesenberry's pacemaker that was corrected by reprogramming. R. 322. Three days later, however, Quesenberry reported a recurrence of his symptoms and that he was feeling poorly. R. 323. Concerned that there was possible restenosis of his venous system, Dr. Wilder referred Quesenberry back to Duke for reevaluation. R. 324.

On June 19, 2009, Quesenberry saw vascular surgeon Mitchell Wayne Cox, M.D., at Duke. R. 263–65. Quesenberry reported that after an angioplasty in August 2008, he had a recurrence of symptoms of "facial fullness and flushing" since April 2009. R. 263. Quesenberry stated that the symptoms increased when he bent over, and that "[h]e also has episodes in which he feels as though things are trying [to] shutdown, approximately 2-3 times a day." R. 263. Quesenberry expressed concern that he may lose his job due to his condition, and that he was contemplating short-term disability. R. 264. Dr. Cox diagnosed him with recurrent superior vena cava syndrome. R. 264. Quesenberry was referred to a catheterization lab for an arteriogram, angioplasty, and likely stenting. R. 264. A venogram and intravascular ultrasound were

6

performed on July 1, 2009, demonstrating only mild stenosis at the atriocaval junction and no stenosis in the superior vena cava. R. 260.

On July 9, 2009, Quesenberry returned to Dr. Wilder, reporting that Duke was unable to help with his symptoms, believed then to be associated with postural hypotension and episodic autonomic dysfunction. R. 321–28. Dr. Wilder noted that Quesenberry "is currently disabled by his symptoms and no suggestions for further therapy have been given." R. 326. Dr. Wilder further indicated that Quesenberry may consider full-time disability, and that "[w]e don't expect his condition to improve in fact it may get worse." R. 326. On November 4, 2009, Dr. Wilder noted at a follow-up visit that Quesenberry's condition is "well compensated with no new problems identified on this visit." R. 319. At that time, Quesenberry was on short-term disability for his presyncopal spells.

Quesenberry saw his rheumatologist on January 19, 2010, and reported that he had no new complaints or joint flare-ups while on the medication Plaquenil, and that he had been doing well. R. 299–304. Quesenberry attributed his improvement to being on disability since July 2009 and being less active because of his cardiac condition, stating that he was "still active enough to be happy with his current condition." R. 300. Quesenberry made similar reports on August 2, 2010, including a statement that he was not limited at his current level of functioning. R. 306–08.

Dr. Wilder completed a Cardiac Residual Functional Capacity Questionnaire on March 10, 2010. R. 405–11. Dr. Wilder diagnosed Quesenberry with autonomic dysfunction, subclavian vein stenosis, and a heart block, accompanied by symptoms of fatigue, weakness, dizziness, and sweatiness. R. 405. Dr. Wilder noted that Quesenberry had marked limitation of physical activity, with symptoms occurring with ordinary physical activity, even though he may be comfortable at rest. R. 406. Dr. Wilder found that Quesenberry was capable of performing low

7

stress jobs. R. 406. Dr. Wilder determined that Quesenberry's prognosis was stable, and that his impairments lasted or could be expected to last at least 12 months. R. 407.

Dr. Wilder concluded that Quesenberry could, in a competitive work situation, sit continuously for two hours before having to alternate postures by walking about, and could return to sitting after less than 15 minutes. R. 407. Cumulatively, Dr. Wilder found that Quesenberry could sit for greater than six hours in an eight-hour workday, not including his time spent walking about. R. 408. Dr. Wilder further found that Quesenberry could stand or walk continuously for greater than three hours before having to sit down for less than fifteen minutes. R. 408. Dr. Wilder indicated that Quesenberry could stand or walk for greater than six hours in an eight-hour work day, not including his sitting breaks. R. 408. Dr. Wilder noted that Quesenberry may need some rest to relieve fatigue throughout a workday, but did not indicate how much rest or at what intervals. R. 409. Dr. Wilder found that Quesenberry should not bend or twist at the waist, and that lifting and bending cause his symptoms. R. 409–10. Finally, Dr. Wilder noted that Quesenberry was likely to have "good days" and "bad days as a result of his condition, but did not offer an opinion on frequency of such days. R. 411.

On May 5, 2010, Quesenberry continued to report that he was having difficulty functioning, and that he is unable to bend over and stand upright without passing out. R. 315. Dr. Wilder again noted that Quesenberry was unable to work because of disabling symptoms. R. 316. On November 3, 2010, Quesenberry again reported disabling symptoms. R. 355. Dr. Wilder noted that the lack of facial swelling or edema suggested restenosis of the subclavaian and superior vena cava.

Quesenberry was referred to a neurologist, Steven D. Nack, D.O., for a consultative evaluation on February 3, 2010. R. 366. Dr. Nack noted that Quesenberry's symptoms occurred

8

"not so much with positional changes of his body or torso or with bending over, but it is simply with positional changes of his head." R. 367. Dr. Nack also noted that it was unusual that Quesenberry's near syncopal episodes had never been captured or recorded by a Holter monitor or other device to determine whether the episodes were cardiac related. R. 366, 368. Quesenberry's neurological examination was unremarkable. R. 368. Dr. Nack found that postural hypotension would be extremely unlikely because his symptoms occur simply from changing head positions. R. 368. Dr. Nack was concerned that Quesenberry's problems might be related to craniocervical junction or ventricular overflow obstruction. Dr. Nack requested a head CT scan and that Quesenberry wear a Holter monitor. R. 368–69.

On March 21, 2011, Quesenberry reported to Dr. Nack that his symptoms remained the same. R. 364. A CT scan showed no intracranial abnormalities. R. 363, 365. Results from the 24-hour Holter monitor also did not show abnormal results. R. 363. Dr. Nack ruled out an underlying cardiac rhythm disturbance, and noted that the possibility of an underlying dysautonomia was remote. R. 364. Dr. Nack ordered a computed tomography angiography (CTA) scan of his head and neck, as well as a tilt table exam. Results of the CTA were normal. R. 359, 403–04. Results of the tilt table exam, according to Dr. Nack, did not show significant bradyarrhythmia or hypotension. R. 359. Dr. Nack wrote on April 25, 2011 that "every time he has been recorded he has never had as dramatic an episode as he describes." R. 359. Dr. Nack concluded that he could not determine a neurological diagnosis to explain the symptoms.

On February 6, 2012, in response to the ALJ's opinion denying benefits, Dr. Wilder wrote in a letter to Quesenberry's attorney that "it is immediately apparent that the [ALJ] did not undertand the paroxysmal nature of the disease. In retrospect I believe that the patient has positional orthostatic tachycardia syndrome (POTS)." R. 222. Dr. Wilder recounted that he had

9

treated Quesenberry with four medications without success, and that to date, Duke University has not come up with a solution.

This record provides substantial evidence in support of the ALJ's decision regarding Dr. Wilder's opinion about Quesenberry's ability to bend and twist. As an initial matter, I note that the only difference between the RFC developed by Dr. Wilder and the final RFC of the ALJ is the bend and twist limitation.[5] Dr. Wilder indicated that Quesenberry could never bend and twist at the waist (R. 410); the ALJ found that was able to do so less than occasionally. R. 24. The finding by the ALJ is supported by other medical records as well as Quesenberry's statements regarding his functionality.

The most compelling source of support for the ALJ's decision are Dr. Nack's records as Quesenberry's treating neurologist. Dr. Nack stated that he was "impressed that the episodes he is describing are not so much with bending over, but are *simply just with changing head positions* such as with flexing his head forward while reading a book or with looking at something on a table." R. 368 (emphasis added). Thus, Dr. Nack found that Quesenberry's symptoms were not induced by bending and twisting, but by head positioning. Dr. Wilder disagreed with this assessment, and thus, the ALJ encountered competing evidence regarding Quesenberry's functionality, both from treating specialists. The ALJ resolved this conflict in favor Dr. Nack's opinion, which is reasonable in light of the evidence of record. Woodhouse ex rel. Taylor v. Astrue, 696 F. Supp. 2d 521, 533 (D. Md. 2010) ("In cases…where there are conflicts in the evidence and differing medical opinions, ALJs have the duty to resolve those

---

[5] As to Quesenberry's argument that the ALJ failed to include a limitation involving rest, I find that the record does not support this assertion. Dr. Wilder did not complete the portion of the RFC questionnaire regarding rest; while he indicated with a checkmark that Quesenberry required some rest during a workday, he failed to answer how much rest Quesenberry required and at what intervals. R. 409. It is therefore speculation from the face of the record to suggest that Dr. Wilder meant to impose a meaningful work restriction in this regard. Therefore, the ALJ committed no error in failing to include a rest limitation in the RFC.

10

conflicts and the corresponding ability to disagree with a medical opinion, so long as substantial evidence supports the position the ALJ takes.").

Also providing support for the ALJ are the statements of functionality by Quesenberry contained in the record that suggest that he could "less than occasionally bend or twist" at the waist, and was not completely precluded from doing so. Quesenberry filled out a function report in October 2009 which suggested that Quesenberry engaged in a myriad of activities that indicated he could sometimes bend or twist. Quesenberry helped care for his children, prepare meals, perform household chores, drive a car, go shopping, and handle finances. R. 195–98. Quesenberry reported that he did things like watching television, attending live sporting events, and woodworking on a daily basis, usually with little difficulty. R. 198. Quesenberry testified at the administrative hearing in September 2011 that he still does woodworking (R. 53) and that he is still capable of driving a car. R. 55. In his wood shop, Quesenberry has his work bench set up so as to obviate the need for him to look down to prevent any symptoms from occurring. R. 53–54. Similarly, Quesenberry is able to read a newspaper without difficulty by holding it up to eye level. R. 55. Finally, Quesenberry testified that the symptoms occur with the tilting of the head and not turning of the head. R. 55–56.

While Dr. Wilder was a specialist with a history of treating Quesenberry, sufficient evidence in the record supports the ALJ's decision to discount the portion of his opinion finding Quesenberry was unable to bend or twist. With the exception of this limitation, the ALJ gave Dr. Wilder's functional assessment great weight, adopting the balance of the opinion into the final RFC. Between the inconsistent evidence from Dr. Nack and the rather robust range of daily activities that Quesenberry remains capable of performing, however, I find it to be a reasonable conclusion in light of the evidence that Quesenberry could less than occasionally bend and twist.

11

## Vocational Expert

Quesenberry also contends that the ALJ erred in relying upon the vocational expert's testimony from the administrative hearing, and more specifically, that the jobs identified by the vocational expert (receptionist, non-emergency dispatcher, and information clerk) were not entry level or unskilled jobs as represented by the vocational expert. The Commissioner concedes that these jobs are classified as semi-skilled by the Dictionary of Occupational Titles ("DOT") and that the vocational expert incorrectly stated at the hearing that these jobs were entry level or unskilled. Pl.'s Br. Summ. J. 17. However, the Commissioner asserts that the ALJ committed no reversible error because the ALJ's RFC did not limit Quesenberry to unskilled or entry-level jobs, and that Quesenberry was in fact capable of performing semi-skilled through skilled work. I agree with the Commissioner that remand is not warranted on this ground.

At the administrative hearing, the ALJ asked if the vocational expert had reviewed Dr. Wilder's functional capacity opinion from March 10, 2010, and asked if someone with the limitations contained therein—including the limitation of low stress work[6]—could perform a particular exertion level of work, with the amended limitation of "less than occasional bending or twisting." R. 59–62. The vocational expert testified that someone with that RFC could perform the representative jobs of receptionist, nonemergency dispatcher, and information clerk, all of which existed in significant numbers in the national economy. R. 62–63. The vocational expert testified that each of these jobs was entry-level or unskilled—an incorrect statement, in light of the fact that the DOT classifies all three jobs as semi-skilled. DOT 215.382-014, DOT 237-367-038, DOT 913.367-010.

---

[6] The vocational expert explained that a low stress job didn't have a lot of production norms or high expectations of management, and typically are "non production type work." R. 60.

12

In his decision, the ALJ stated that Quesenberry had additional limitations that precluded him from performing the full range of sedentary work. R. 25. The ALJ further stated that "[t]o determine the extent to which these limitations erode the unskilled sedentary occupational base, the [ALJ] asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity" and that the vocational expert responded with the representative jobs. R. 25. The ALJ also stated that "[p]ursuant to SSR 00-4p, the undersigned has determined that the vocational expert's testimony is consistent with the information contained in the [DOT]." R. 25.

Here, it is clear that the vocational expert misstated the skill level of the identified jobs. That fact alone, however, does not constitute a basis for remand unless the misstatement translated into reversible error by the ALJ. I find that is not the case here. The vocational expert's identification of the jobs' skill level, although incorrect, was not essential to the ALJ's analysis. As indicated above, the RFC developed by the ALJ was supported by the record. That RFC did not contain a limitation to unskilled work. The ALJ's hypothetical question to the vocational expert fully encompassed that RFC, and the jobs identified by the vocational expert match the limitations set forth in the RFC, including a limitation to low stress, nonproduction type jobs. The hypothetical question to the vocational expert did not contain a limitation of entry level or unskilled work. That the ALJ represented in his decision that he asked the vocational expert about unskilled work does not alter the fact that the final RFC contained no such limitation. Cameron v. Astrue, 7:10CV00058, 2011 WL 2945817, at *3 (W.D. Va. July 21, 2011) (procedural perfection in administrative proceedings is not required and remand is required "only when substantial evidence to support the ALJ's decision does not exist"). Additionally, because the vocational expert's misstatement about skill level was peripheral to the

13

ALJ's decision, I find no meaningful conflict existed between the vocational expert's testimony and the DOT that required reconciliation under Social Security Ruling 00-4p.

In any event, substantial evidence establishes that Quesenberry was capable of performing the sedentary, semi-skilled work identified by the vocational expert. The regulations provide that, absent evidence to contradict it, someone with a high school education is generally capable of performing semi-skilled or skilled work. 20 C.F.R. 404.1564(b)(5). Quesenberry's ability to communicate in English is also a relevant educational factor indicative of his capability to perform the jobs identified. 20 C.F.R. 404.1564(b)(4). Furthermore, Quesenberry's past work consisted of semi-skilled and skilled work (assistant manager, receiving clerk, and truck driver) and the ALJ found that he could not perform these jobs because they were at exertion levels greater than sedentary, and not because of their skill level. R. 24. Finally, Quesenberry does not put forth any evidence that he was not capable of performing work at the semi-skilled level or that he did not have the mental or vocational skills to perform the jobs identified by the vocational expert.

For these reasons, I find that remand is not proper on the basis that the vocational expert incorrectly testified as to the skill level of the jobs Quesenberry was capable of performing.

## Credibility

Quesenberry argues that the ALJ erred in discrediting his testimony about the disabling nature of his symptoms. The substance of the ALJ's credibility analysis is as follows:

> The objective medical evidence and the claimant's treatment history do not support a finding of disability. The undersigned nevertheless finds the claimant's allegations as a whole are generally credible but concludes that the limitations stemming from the claimant's impairments would not preclude all work. The claimant has sought treatment with cardiologists, rheumatologists, and neurologists. His rheumatism is shown to be under good control. Doctors have been unable to pinpoint the cause of the claimant's near-syncopal episodes, but such episodes apparently occur only with looking down, and as discussed below,

14

> the claimant admitted he still is able to engage in activities such as woodworking
> and driving. Doctors also have found the claimant in no distress, a finding
> inconsistent with complaints of debilitating symptoms.

R. 22–23 (citations omitted). Quesenberry objects to this reasoning for two main reasons: first, the ALJ improperly relied on evidence of Quesenberry's activities of daily living to discredit him, and second, that Quesenberry's lack of distress at office visits was not a legitimate basis for finding him not credible.

Credibility determinations are emphatically the province of the ALJ, and courts normally should not interfere with these determinations. See, e.g., Chafin v. Shalala, No. 92-1847, 1993 WL 329980, at *2 (4th Cir. Aug. 31, 1993) (per curiam) (citing Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990) and Thomas v. Celebrezze, 331 F.2d 541, 543 (4th Cir. 1964)). Here, the ALJ's credibility determination is supported by substantial evidence. It should not be disturbed. See Johnson v. Barnhart, 434 F.3d 650, 658-59 (4th Cir. 2005) (per curiam) (citing Craig, 76 F.3d at 589).

First, I find that sufficient evidence exists in the record to support the ALJ's reliance on Quesenberry's activities of daily living, specifically his ability to do woodworking and to drive. In addition to reporting a myriad of daily activities inconsistent with disability in his function report in October 2009 (R. 195–98), Quesenberry testified at the administrative hearing that he remained capable of both doing woodworking and driving a vehicle. R. 53, 55. While Quesenberry also stated that he adjusted his woodworking bench to accommodate his condition and that he drove less than he used to, he remained capable of these activities nonetheless, suggesting that his symptoms did not prevent him from doing all work. Given the risks involved, both activities are not something that an individual with a disabling propensity to faint are likely to engage with any regularity, as Quesenberry claims he does. A claimant's activities of daily

15

living are a highly probative factor in determining the credibility of their allegations, see, e.g., Dolfax v. Astrue, 7:09-CV-67-FL, 2010 WL 1488116, at *11 (E.D.N.C. Mar. 18, 2010), and the ALJ could properly rely on these activities in evaluating Quesenberry's credibility.

The ALJ also could properly rely on the records from Quesenberry's visits to medical providers that suggested that he could perform some form of work. While it is true that Quesenberry's symptoms and distress appear to be provoked by changing of his head position, Dr. Nack observed that Quesenberry was never able to replicate for doctors episodes as severe as he stated occurred at home and specifically that "every time he has been recorded he has never has as dramatic an episode as he describes." R. 359. As also noted by the ALJ, Quesenberry's rheumatologist found that his symptoms from rheumatism were under good control while on medication. R. 299–304, 306–08.

The ALJ found that Quesenberry was generally credible, but that his symptoms did not preclude him from performing all work. The ALJ's conclusion in this regard is supported by the evidence, and the ALJ adequately explained his reasons for so deciding. Accordingly, I must affirm the ALJ's decision on this ground.

## CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that an order be entered **AFFIRMING** the final decision of the Commissioner, **GRANTING** summary judgment to the defendant, **DENYING** plaintiff's motion for summary judgment, and **DISMISSING** this case from the court's docket.

The Clerk is directed to transmit the record in this case to Michael F. Urbanski, United States District Judge, and to provide copies of this Report and Recommendation to counsel of record. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any

objections to this Report and Recommendation within fourteen (14) days hereof. Any adjudication of fact or conclusion of law rendered herein by me that is not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings as well as to the conclusion reached by me may be construed by any reviewing court as a waiver of such objection.

    Enter: July 30, 2014

*Robert S. Ballou*

Robert S. Ballou
United States Magistrate Judge