IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| LARRY W. QUESENBERRY, ) | |
| ) | |
|    Plaintiff, ) | |
| ) | Civil Action No. 7:13cv00090 |
| v. ) | |
| ) | |
| CAROLYN W. COLVIN, ) | By:  Michael F. Urbanski |
| Commissioner of Social Security, ) |      United States District Judge |
| ) | |
|    Defendant. ) | |

## MEMORANDUM OPINION

This social security disability appeal was referred to the Honorable Robert S. Ballou, United States Magistrate Judge, pursuant to 28 U.S.C. § 636(b)(1)(B), for proposed findings of fact and a recommended disposition. The magistrate judge filed a report and recommendation on July 30, 2014, recommending that plaintiff's motion for summary judgment be denied, the Commissioner's motion for summary judgment be granted and the Commissioner's final decision be affirmed. Plaintiff has filed objections to the report and this matter is now ripe for the court's consideration.

### I.

Rule 72(b) of the Federal Rules of Civil Procedure permits a party to "serve and file specific, written objections" to a magistrate judge's proposed findings and recommendations within fourteen days of being served with a copy of the report. See also 28 U.S.C. § 636(b)(1). The Fourth Circuit has held that an objecting party must do so "with sufficient specificity so as reasonably to alert the district court of the true ground for the objection." United States v. Midgette, 478 F.3d 616, 622 (4th Cir.), cert denied, 127 S. Ct. 3032 (2007).

> To conclude otherwise would defeat the purpose of requiring objections. We would be permitting a party to appeal any

> issue that was before the magistrate judge, regardless of the nature and scope of objections made to the magistrate judge's report. Either the district court would then have to review every issue in the magistrate judge's proposed findings and recommendations or courts of appeals would be required to review issues that the district court never considered. In either case, judicial resources would be wasted and the district court's effectiveness based on help from magistrate judges would be undermined.

Id. The district court must determine de novo any portion of the magistrate judge's report and recommendation to which a proper objection has been made. "The district court may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3); accord 28 U.S.C. § 636(b)(1).

If, however, a party "'makes general or conclusory objections that do not direct the court to a specific error in the magistrate judge's proposed findings and recommendations,'" de novo review is not required. Diprospero v. Colvin, No. 5:13-cv-00088-FDW-DSC, 2014 WL 1669806, at *1 (W.D.N.C. Apr. 28, 2014) (quoting Howard Yellow Cabs, Inc. v. United States, 987 F. Supp. 469, 474 (W.D.N.C. 1997) (quoting Orpiano v. Johnson, 687 F.2d 44, 47 (4th Cir. 1982))). "The court will not consider those objections by the plaintiff that are merely conclusory or attempt to object to the entirety of the Report, without focusing the court's attention on specific errors therein." Camper v. Comm'r of Soc. Sec., No. 4:08cv69, 2009 WL 9044111, at *2 (E.D. Va. May 6, 2009), aff'd, 373 F. App'x 346 (4th Cir.), cert. denied, 131 S. Ct. 610 (2010); see Midgette, 478 F.3d at 621 ("Section 636(b)(1) does not countenance a form of generalized objection to cover all issues addressed by the magistrate judge; it contemplates that a party's objection to a magistrate judge's report be specific and particularized, as the statute directs the district court to review only '*those portions* of the report or *specified* proposed findings or recommendations *to which objection is made*.'"). Such

2

general objections "have the same effect as a failure to object, or as a waiver of such objection." Moon v. BWX Technologies, 742 F. Supp. 2d 827, 829 (W.D. Va. 2010), aff'd, 498 F. App'x 268 (4th Cir. 2012); see also Thomas v. Arn, 474 U.S. 140, 154 (1985) ("[T]he statute does not require the judge to review an issue de novo if no objections are filed").

Additionally, objections that simply reiterate arguments raised before the magistrate judge are considered to be general objections to the entirety of the report and recommendation. See Veney v. Astrue, 539 F. Supp. 2d 841, 844-45 (W.D. Va. 2008). As the court noted in Veney:

> Allowing a litigant to obtain de novo review of [his] entire case by merely reformatting an earlier brief as an objection "mak[es] the initial reference to the magistrate useless. The functions of the district court are effectively duplicated as both the magistrate and the district court perform identical tasks. This duplication of time and effort wastes judicial resources rather than saving them, and runs contrary to the purposes of the Magistrates Act." Howard [v. Sec'y of Health & Human Servs.], 932 F.2d [505,] [] 509 [(6th Cir. 1991)].

539 F. Supp. 2d at 846. A plaintiff who reiterates his previously-raised arguments will not be given "the second bite at the apple []he seeks;" instead, his re-filed brief will be treated as a general objection, which has the same effect as would a failure to object. Id.

## II.

In his objections to the report and recommendation, Quesenberry takes issue with the following findings of the magistrate judge: (1) that the Administrative Law Judge (ALJ) did not err in failing to give greater weight to the opinion of Dr. Wilder, specifically with respect to Quesenberry's ability to bend or twist; (2) that the vocational expert's testimony does not constitute reversible error; and (3) that the record evidence supports the ALJ's credibility determination. The court has conducted a de novo review of these portions of

3

the magistrate judge's report and concludes the Commissioner's decision is supported by substantial evidence.

## III.[1]

The issue here is largely one of credibility. Quesenberry states that he suffers from what are referred to in the record as "near-syncopal" episodes, which he describes as follows:

> Usually just, sometimes I get sick on my stomach, sometimes it's, it's just where I feel really dizzy, disoriented a little bit. All this, this is, it's like, it just feels like something is sucking the energy out of my body and, and it takes me a while to regain it. I don't know how else to describe the feeling, it just, it's, actually, I feel like my energy level is, is going down.

(Administrative Record, hereinafter "R." 52.) Quesenberry claims to experience these episodes daily (R. 39), anywhere from four to five times per day (R. 54), and states that it takes him "generally a couple hours" to recover, get his energy back and "feel normal again" (R. 52). He states he never loses consciousness. (R. 55, 366.) The record reflects that Quesenberry reported having had these spells as far back as 1998 and has sought treatment for this condition from his primary care provider, a cardiologist, and a neurologist during the relevant period. He has also been referred to Duke University Medical Center where he received an evaluation. None of these providers have been able to ascertain what is causing these episodes and how to prevent them.

Notes from Quesenberry's May 2008 neurological evaluation with Dr. Lisa D. Hobson-Webb at Duke state Quesenberry has:

> [A] 10 year history of syncopal episodes and pacemaker implanted to prevent these episodes. He continues to have near syncopal events that significantly limit his activities of

---

[1] Detailed facts about Quesenberry's impairments and medical and procedural history can be found in the report and recommendation (Dkt. # 23) and in the administrative transcript (Dkt. # 7). As such, they will not be repeated here.

4

>                   daily living and make him very fearful of losing his job or
>                   having an accident at work. On examination today, his
>                   symptoms were reproduced by simple neck flexion and by
>                   mild physical exertion.

(R. 277-78.) Nevertheless, in spite of these symptoms, Quesenberry managed to work as an assistant manager at a tool and equipment retailer, where he was required to lift and carry various products that weighed up to 100 pounds (R. 176-77), until July 13, 2009, when he states "it was just getting to the point where with everything hitting me, it was just getting impossible for me to do my job." (R. 46.)

Based on this and Quesenberry's other impairments, the ALJ limited Quesenberry to a range of low-stress, sedentary work. (R. 19.) In fashioning this RFC assessment, the ALJ gave great weight to the opinion set forth by Quesenberry's treating cardiologist, Dr. Wilder, in a Cardiac Residual Functional Capacity Questionnaire dated March 10, 2010.[2] (R. 24; see R. 405-11.) However, the ALJ determined that Quesenberry could bend or twist "less than occasionally" (R. 19), whereas Dr. Wilder stated that Quesenberry could never bend or twist at the waist (R. 410). A complete inability to bend or twist would preclude all work, according to the vocational expert's testimony. (R. 61-62.)

With respect to this deviation from Dr. Wilder's opinion, the ALJ stated:

> Dr. Wilder's opinion regarding never bending or twisting is inconsistent with the claimant's statements and Dr. Nack's observations that the claimant becomes symptomatic not with bending per se but with positioning of the head. The record therefore does not support a limitation of absolutely no bending or twisting, but it is reasonable to find the claimant can less than occasionally bend or twist.

---

[2] The ALJ, however, did not give great weight to conclusory statements made by Dr. Wilder in his treatment notes of September 30, 2009 and August 23, 2010 that Quesenberry is unable to work because of his disabling symptoms. (R. 316, 326.) The ALJ did not err in doing so; a physician's opinion that a patient is unable to work is not a medical opinion and is instead an opinion on an issue reserved to the Commissioner. 20 C.F.R. § 404.1527(d)(1).

5

(R. 24.) The magistrate judge held that the ALJ's finding in this regard is supported by substantial evidence, stating:

> The most compelling source of support for the ALJ's decision are Dr. Nack's records as Quesenberry's treating neurologist. Dr. Nack stated that he was "impressed that the episodes he is describing are not so much with bending over, but are *simply just with changing head positions* such as with flexing his head forward while reading a book or with looking at something on a table." R. 368 (emphasis added). Thus, Dr. Nack found that Quesenberry's symptoms were not induced by bending and twisting, but by head positioning.

Report & Recommendation, Dkt. # 23, at 10. Quesenberry objects to the magistrate judge's characterization of Dr. Nack's opinion in this regard, arguing that "Dr. Nack's [notes] indicate more than just a straight forward opinion that plaintiff's episodes only occur with changing head positions." Pl.'s Objection, Dkt. # 24, at 2. Quesenberry points to Dr. Nack's statement that "[w]hen [plaintiff] goes to stand after bending over, he feels as if his symptomatology is worse and following the episodes, 'It drains me of energy.'" Id. Quesenberry thus concludes that "it is erroneous for the Court to state that Dr. Nack simply opined plaintiff's episodes only occur with changing his head position." Id.

To be sure, Dr. Nack stated that Quesenberry feels his symptoms are worse after bending over, but he did so in the context of reciting Quesenberry's subjective complaints. (R. 366.) Later he notes:

> Indirectly when I walked back in the room, [Quesenberry] tells me he likes to read and with bending his head down to read a book he will become symptomatic. Thus, it is not so much with positional changes of his body or torso or with bending over, but it is simply with positional changes of his head.

(R. 367.) Dr. Nack went on to state:

> First of all, I find it unusual that Mr. Quesenberry has had daily episodes with simply bending over, with tying his shoes, or with simply looking down to read, and that this has not

6

> been recorded with a Holter or an event recorder to say whether such episodes are or are not cardiac related. In addition, it seems a little unusual that he has not had a tilt table. In this regard, I would like to send for records from Duke to find out what their evaluation entailed.
>
> His neurological examination is normal. I am impressed that the episodes he is describing are not so much with bending over, but are simply just with changing head positions such as with flexing his head forward while reading a book or with looking at something on a table.

(R. 368.) Thus, Dr. Nack clearly remarked that Quesenberry's reported symptoms manifest not only upon bending over but also with mere flexion of the head. Indeed, this is precisely how both Quesenberry and his counsel described his symptoms at the administrative hearing. (See R. 36, 38, 40)

To give full credence to Quesenberry's complaints of near-syncopal episodes then would require a finding that Quesenberry could never bend or twist *or* flex his head. And as the magistrate judge noted, "the rather robust range of daily activities that Quesenberry remains capable of performing," belies any such limitation.

For instance, Quesenberry testified that he makes wood crafts for his family at a workshop, but said he sets his work bench up so that he does not have to look down when doing so. (R. 53-54). He is able to drive, although he claims he does not drive as much as he once did. (R. 55.) Quesenberry indicated he has no problem with personal care (R. 195), helps wife with his children (R. 195), and is able to prepare meals (R. 196). With respect to household chores, Quesenberry stated: "A lot of things I can do. It just may take longer to do them." (R. 196). He can go out alone (R. 197), shop (R. 197), and socialize several times per week (R. 198). His interests include watching sports on TV and in person, woodworking, and spending time with his kids. (R. 198.) Quesenberry indicated on his function report that he does these things "[e]veryday and usually w/little problems" (R. 198),

7

although he testified at the administrative hearing that his symptoms had been interfering with his activity level more frequently. (R. 57-58.)

Substantial evidence supports the ALJ's conclusion that "[t]he record [ ] does not support a limitation of absolutely no bending or twisting, but it is reasonable to find the claimant can less than occasionally bend or twist." (R. 24.) The court notes that the ALJ gave great weight to the opinion of Quesenberry's treating cardiologist, Dr. Wilder, in all respects other than Quesenberry's ability to bend and twist, finding Dr. Wilder's opinion to be consistent with the treatment notes and objective findings in the record. The ALJ also found Quesenberry's subjective complaints to be generally credible, except to the extent they are inconsistent with his residual functional capacity assessment. (R. 23.) To that end, he declined to find Quesenberry could never bend or twist but nevertheless limited him to bending and twisting only "less than occasionally."[3]

A different factfinder may have reached another conclusion in this case. However, the court's role on judicial review is limited to determining whether this factfinder's conclusion is supported by substantial evidence. See Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); see also Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966). The court is mindful that it must not "re-weigh the conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996). In this case, substantial evidence supports the Commissioner's decision that Quesenberry can perform a limited range of low-stress work at the sedentary level. (R. 19.)

---

[3] This finding reflects an even greater degree of limitation than was found by the reviewing state agency physicians, who opined that Quesenberry could occasionally stoop (i.e., bend at the waist), kneel and crouch. (R. 73, 85.)

8

## IV.

Finally, Quesenberry objects to the magistrate judge's finding that the vocational expert's testimony did not constitute reversible error. At the administrative hearing, the vocational expert testified in response to the ALJ's hypothetical that Quesenberry could perform work as a receptionist, a dispatcher, and an information clerk, all of which the vocational expert identified as sedentary in exertion and "entry level" positions. (R. 63.) Quesenberry argued on summary judgment that these jobs are not, in fact, entry level, but are classified as semi-skilled jobs according to the Dictionary of Occupational Titles (DOT). Quesenberry asserted that in violation of Social Security Ruling 00-4p, the ALJ failed to ask the vocational expert if his testimony conflicted with the DOT and explain his resolution of any conflict. The magistrate judge determined that remand on these grounds was not warranted, however, because the ALJ did not limit Quesenberry to unskilled or entry-level work, and thus identification of the skill level was not essential to the ALJ's analysis. The magistrate judge held:

> [T]he RFC developed by the ALJ was supported by the record. That RFC did not contain a limitation to unskilled work. The ALJ's hypothetical question to the vocational expert fully encompassed that RFC, including a limitation to low stress, nonproduction type jobs. The hypothetical question to the vocational expert did not contain a limitation of entry level or unskilled work.

Report & Recommendation, Dkt. # 23, at 13. The magistrate judge noted that Quesenberry has a high school education (R. 24) and thus is generally considered to be able to perform semi-skilled through skilled work. 20 C.F.R. § 404.1564(b)(4). Indeed, Quesenberry's past work consisted of semi-skilled and skilled work, and the ALJ found that he could not perform this past work because of the exertional requirements of the jobs, not because of skill level. Report & Recommendation, Dkt. # 23, at 14. Moreover, Quesenberry did not

9

put forth any evidence to suggest that he was incapable of performing semi-skilled or skilled work. Thus, the magistrate judge concluded that remand was not necessary, because there was no meaningful conflict between the vocational expert's testimony and the DOT that required reconciliation under SSR 00-4p. Id. at 14.

In his objection, Quesenberry argues:

> The Court's error is that it fails to recognize that whether or not plaintiff can actually perform semi-skilled or skilled work is not what is at issue in plaintiff's case. The ALJ clearly limited plaintiff to unskilled work even though he did not list this limitation in his RFC findings. (R. 25.)

Pl.'s Objections, Dkt. # 24, at 3. The court does not agree that the ALJ "clearly limited plaintiff to unskilled work." The regulations define "unskilled work" as:

> [W]ork which needs little or no judgment to do simple duties that can be learned on the job in a short period of time. The job may or may not require considerable strength. For example, we consider jobs unskilled if the primary work duties are handling, feeding and offbearing (that is, placing or removing materials from machines which are automatic or operated by others), or machine tending, and a person can usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed. A person does not gain work skills by doing unskilled jobs.

20 C.F.R. § 404.1568(a). Nothing in the ALJ's residual functional capacity determination suggests that Quesenberry is limited to unskilled work.[4] Likewise, there is nothing in the medical records to support a finding that he is limited to work "which needs little or no

---

[4] Quesenberry cites to page 25 of the administrative record in arguing the ALJ clearly limited plaintiff to unskilled work even though he did not list this limitation in his RFC findings. The court notes that on page 25, in discussing his findings at step 5 of sequential evaluation process, the ALJ stated: "To determine the extent to which these limitations erode the unskilled sedentary occupational base, the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity." While the ALJ did indeed use the word "unskilled" in this sentence, he did not limit Quesenberry to unskilled work in his residual functional capacity assessment (R. 19), and he likewise did not include any "unskilled" limitation in his hypothetical to the vocational expert, which elicited the testimony of the three jobs at issue. (R. 58-63.) Instead, the ALJ limited Quesenberry to "low stress" jobs, which Quesenberry concedes is not the same as unskilled work. Pl.'s Objections, Dkt. # 24, at 3.

10

judgment to do simple duties that can be learned on the job in a short period of time." Id. As the magistrate judge pointed out, Quesenberry has a high school education and thus is generally considered to be able to perform semi-skilled through skilled work. 20 C.F.R. § 404.1564(b)(4). Moreover, he has previously worked at jobs that are considered to be semi-skilled and skilled. (R. 58-59.) The court finds no error in the magistrate judge's conclusion that this discrepancy in the vocational expert's testimony does not warrant remand.

## V.

The court has reviewed the magistrate judge's report, the objections to the report, and the administrative record and, in so doing, made a de novo determination of those portions of the report to which Quesenberry objected. The court finds that the magistrate judge was correct in concluding that there is substantial evidence in the record to support the ALJ's decision. As such, the magistrate judge's report and recommendation will be adopted in its entirety.

An appropriate Order will be entered to that effect.

Entered: September 24, 2014

*Michael F. Urbanski*

Michael F. Urbanski
United States District Judge

11

Case 7:13-cv-00090-MFU-RSB   Document 25   Filed 09/24/14   Page 11 of 11   Pageid#: 527